**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

REBECCA NICHOLS, *also known as*
REBECCA CHADWELL,

CRIMINAL CASE NO.

1:15-cr-00166-ELR-RGV

**FINAL REPORT, RECOMMENDATION, AND
ORDER ON DEFENDANT'S PRETRIAL MOTIONS**

Defendant Rebecca Nichols, also known as Rebecca Chadwell ("defendant"), is charged in a one-count indictment with knowingly employing, using, persuading, inducing, enticing, and coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing that the visual depiction would be transmitted using a means and facility of interstate and foreign commerce, including by computer and telephone, in violation of 18 U.S.C. §§ 2251(a) and 2251(e). [Doc. 10].[1]  Defendant has moved to suppress evidence, [Docs. 21 & 25], which the government opposes, [Doc. 28], and defendant has filed a reply in support of these motions, [Doc. 32].  Defendant also has moved to suppress statements, [Doc. 22], and following an evidentiary hearing on defendant's

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

motion,[2] the parties filed post-hearing briefs, see [Docs. 48, 53, & 57], and the pending motions are ready for ruling. For the reasons that follow, it is **RECOMMENDED** that defendant's motions, [Docs. 21, 22, & 25], be **DENIED**.

## I.  STATEMENT OF FACTS

On April 16, 2015, Special Agent Scott Warren ("Agent Warren"), of the Federal Bureau of Investigation's ("FBI") Violent Crimes Against Children Squad, applied for and received a search warrant for a residence located at 815 Gateshead Lane, Lawrenceville, Georgia.  [Doc. 25-1]; see also (Tr. at 22-23).  In his affidavit in support of the application for the search warrant, Agent Warren recounted his employment history; explained that certain statements provided in his affidavit were partly based on information provided to him by FBI Special Agent Jason Beachey ("Agent Beachey"), who is assigned to the Violent Crimes Against Children Unit in the Netherlands; and then detailed a child pornography investigation by the National Police of the Netherlands ("NPTN") that involved a suspect named Guus Pot ("Pot").  [Doc. 25-1 at 7-10].

---

[2] See [Doc. 35] for a transcript of the evidentiary hearing held on September 10, 2015.  Citations to the evidentiary hearing transcript are to the actual transcript page number shown on the top right corner, and will be referred to as "(Tr. at ___)." In addition, the government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)."

Agent Warren explained that on April 15, 2015, NPTN investigators "forensically reviewed digital media devices owned by [Pot] that were located at a residence that he was staying at in the Netherlands" and that they "observed at least one non-pornographic image of [Pot] with an unknown adult female and an unknown female child," as well as "numerous images of suspected child pornography that appeared to depict the same child from the non-pornographic image." [Id. at 8 ¶ 4].  On this same day, NPTN investigators interviewed Pot and he relayed that the "images of child pornography were produced for him by a woman named Rebecca Chadwell, who live[d] at 815 Gateshead Lane, Lawrenceville, Georgia 30043," that he had "previously travelled to Lawrenceville, Georgia, and stayed at Chadwell's residence," that he met "Chadwell's daughter (Minor Victim 1) when he stayed at her residence," and that he "continued to communicate with Chadwell via the Internet after he returned to the Netherlands." [Id. at 8 ¶ 5 (all caps omitted)].

On the following day, April 16, 2015, Agent Beachey met with the NPTN investigators and "reviewed approximately ten images of child pornography that were recovered from [Pot's] digital media devices and that depicted Minor Victim 1," and he observed about "six images that depicted the lewd and lascivious display of the genitals of Minor Victim 1." [Id. at 8-9 ¶ 6].  Agent Beachey also observed that

"Minor Victim 1 appeared to be between the age of 7 and 10 years." [Id. at 9 ¶ 6]. The NPTN investigators advised Agent Beachey that "at least some of the images of child pornography contain[ed] the metadata that list the date that the picture was taken as February 12, 2015." [Id. at 9 ¶ 7].

Based on the information that was relayed to Agent Warren on April 16, Agent Warren immediately "queried the open source database Clear" and discovered that "Leonard Chadwell . . . and Rebecca Nichols . . . reside[d] at 815 Gateshead Lane, Lawrenceville, Georgia 30043," and he also "queried the Gwinnett County property records" and discovered that Leonard Chadwell owned that residence and "queried the Georgia Department of Driver Services (GDDS) records an[d] learned that both Leonard Chadwell and Rebecca Nichols list[ed] the address 815 Gateshead Lane, Lawrenceville, Georgia 30043, as their residence." [Id. at 9 ¶¶ 8-10]. Agent Warren explained that the "GDDS records also included a photo of Rebecca Nichols," and that he then "searched Facebook.com, a social networking website, for Rebecca Chadwell's account and observed one account with the ID of 'rebecca.nichols.735' and the display name of 'Rebecca Chadwell,'" with photos attached to that account that "appeared to be the same person as the GDDS photo of Rebecca Nichols." [Id. at 9-10 ¶¶ 10-11]. Agent Warren also explained that he observed "two photos of a minor female in the [Facebook] account with associated

4

captions indicating that the child depicted in the photo was the daughter of Nichols," and that Agent Beachey provided him with "sanitized" copies of some of the images of Minor Victim 1, which were "consistent with the descriptions of the child pornography that [Agent] Beachey [had] observed, and . . . appear[ed] to be the same child" captioned as "the daughter of Nichols" from "Nichols' Facebook.com account." [Id. at 10 ¶¶ 11-12]. Finally, Agent Warren related that another FBI Agent with the Atlanta Division surveilled the 815 Gateshead Lane residence and observed a blue-colored Saturn Vue parked at the residence with a license plate "registered to Leonard Chadwell at that residence." [Id. at 10 ¶ 13].

Following his description of the investigation, Agent Warren then detailed behavioral characteristics of child pornography collectors, including that individuals with "a sexual interest in minors" usually "collect sexually explicit or suggestive materials . . . depicting minors in sexually suggestive and/or explicit poses" and that they "[r]arely dispose of their collection[.]" [Id. at 10-11 ¶ 14]. He also included a section in his affidavit entitled, "Specifics of Search and Seizure of Computer Systems," in which he explained that "during the search of the premises it [was] typically not feasible to search computer equipment and storage devices for data (including images of child pornography) for a number of reasons, including" that searching computer systems can be a "highly technical process" requiring specific

expertise and specialized equipment and often computer personnel, the massive

volume of data stored on many computer systems and storage devices, and the

"substantial amount of time [] necessary to extract and sort through data that [was]

concealed or encrypted."  [Id. at 11-13 ¶ 15 (second alteration in original)].  Thus,

Agent Warren requested the Court's permission to:

> [S]eize all computer hardware, associated peripherals and storage
> media that may be found on the premises described in Attachment A
> and that may contain some or all of the evidence described in this
> affidavit and Attachment B, and to conduct an off-site search of the
> same for evidence, fruits and instrumentalities of violations of Title 18,
> United States Code, Sections 2252(a) and 2251(b).

[Id. at 13 ¶ 15(e)].[3]  Agent Warren also explained that because the investigation

involved the "possible ongoing sexual abuse of a child, FBI agents intend to execute

the search warrant as soon as possible," but that the search team may not be ready

to execute until after 6:00 p.m. and he therefore requested permission to "execute the

---

[3] Attachment A identified the place to be searched as the single family residence located at 815 Gateshead Lane, Lawrenceville, Georgia 30043, and provided a detailed description of the exterior of the residence, as well as a photo depicting a partial view of the front of the residence.  See [Doc. 25-1 at 15]. Attachment B described the items to be seized as computers, computer hardware and software, computer-related documents, computer passwords and data security devices, videotapes, video recording devices, video recording players, cameras, film, cellular telephones, or other video display and storage devices that "can access, record, store, and/or display images or videos of child pornography or child erotica or information pertaining to an interest in child pornography or sexual activity with minors," among other items.  See [id. at 16-17].

search warrant at any time of the day or night, including after 6:00 p.m." [Id. at 13-14 ¶ 16].

Based on the foregoing information, Agent Warren stated that he believed there was probable cause that evidence of violations of 18 U.S.C. §§ 2251(b), 2252(a)(2), and 2252(a)(5)(B) would be located "on the premises described in Attachment A, and that this evidence, listed in Attachment B, [was] contraband, the fruits of crime, or things otherwise criminally possessed, and/or [was] property which is or has been used as the means of committing the foregoing offenses." [Id. at 14 ¶ 17].  At 3:05 p.m. on April 16, 2015, the Honorable Alan J. Baverman, United States Magistrate Judge for the Northern District of Georgia, signed the search warrant, authorizing law enforcement to "search for and seize [] certain property," including "computers, computer peripherals, electronic media storage devices, and other items as more particularly described in Attachment B," from the residence and curtilage located at 815 Gateshead Lane, Lawrenceville, Georgia 30043.  See [id. at 1, 3-6].

On this same day, at approximately 5:00 p.m., Agent Warren, along with about 30 individuals, including his team of law enforcement agents from the FBI and the Gwinnett County Police Department, an FBI victim specialist, and a

representative from the Georgia Department of Family and Children Services,[4] arrived at the subject residence,[5] and the entry team comprised primarily of FBI agents knocked on the door, announced that they were with the FBI and were there to execute a search warrant, and initially made contact with either defendant or another individual who was inside the residence at the time.[6]  (Tr. at 4-7, 16-19). Defendant, her daughter, and her roommate, Patrick Kindle ("Kindle"), were removed from the residence while law enforcement secured it,[7] and the agents

---

[4] At the evidentiary hearing, Agent Warren explained that "some of those folks were responsible for making entry and securing the residence[;] [s]ome of them were responsible for securing the perimeter of the residence[;] [o]ther individuals were there to search, photograph, sketch, [and] inventory evidence[; and] [t]here w[ere] also individuals there to interview the occupants of the residence as well as if there were any children found in the residence to try to get those children interviewed forensically."  (Tr. at 6).  He explained that he believed children would be located inside the residence based on his initial records checks and background searches, as well as law enforcement surveillance from earlier in the day that revealed "at least one child going into the residence from the bus."  (Tr. at 6-7).

[5] Agent Warren described the residence as a two-story, single family home with a basement.  (Tr. at 5).

[6] At the time of entry into the residence, Agent Warren testified that his firearm was holstered, but that other members of the entry team would have had their firearms out.  (Tr. at 18).

[7] Defendant remained outside with Special Agent Mary Jo Mangrum ("Agent Mangrum"), while Kindle remained outside with Agent Warren.  (Tr. at 20). Initially, defendant's daughter remained with one of the Task Force officers, but she was subsequently taken into custody by a representative with Georgia's Department of Family and Children Services.  (Tr. at 19).

subsequently determined that the basement would be the most comfortable spot to interview defendant "privately and not in the way of the search team."[8] (Tr. at 7, 19, 21-22, 35). Approximately 20 to 30 minutes after their arrival at the residence, Agent Warren, along with Special Agent Keith Kabrhel ("Agent Kabrhel") and Agent Mangrum, interviewed defendant,[9] who was seated across from Agent Warren in one of the chairs at the table and not handcuffed or physically restrained in any way.[10] (Tr. at 7-8, 10, 13-14, 21, 34).

Prior to interviewing defendant, Agent Warren explained to defendant that they were there to execute a search warrant, which he indicated he would show her

---

[8] Agent Warren described the basement as a "pretty large room, kind of one big room" with a table, a couple of chairs, and a bed.  (Tr. at 8).

[9] Agent Warren testified that Agent Mangrum was present during the interview at defendant's request and that he believed defendant "wanted a female in the room while [they] were doing the interview," explaining that Agent Mangrum was the first person defendant encountered when she exited the residence while law enforcement secured it and that she "felt comfortable with her."  (Tr. at 8-9). Defendant also requested the presence of one of her dogs, a black Labrador Retriever, which she described as "like a PTSD dog that comforted her," and asked the agents to close the door leading into the basement room so that her dog would not leave.  (Tr. at 9-10, 25, 29-30); see also (Gov. Ex. 2).  The entire interview from the moment the agents entered the basement was audio recorded.  See (Tr. at 15-16, 21; Gov. Ex. 2).

[10] In fact, defendant was not handcuffed at any point during the entire encounter until after she was arrested following the interview.  (Tr. at 14).

later,[11] and he then advised her of her Miranda[12] rights from a standard FBI Advice of Rights and Waiver form by first reading the contents of the form aloud to her and then having her read the form aloud back to him to ensure that she completely understood her rights. (Tr. at 10-11, 25, 32-33; Gov. Exs. 1 & 2).[13]  Defendant indicated that she understood her rights and she agreed to speak with the agents, and at 5:39 p.m., she signed the waiver portion of the form, acknowledging that she had read her rights, understood them, and that she was "willing to answer questions without a lawyer present." (Tr. at 11, 27-28; Gov. Ex. 1).  Agent Kabrhel also signed the form as a witness directly below Agent Warren's signature. (Tr. at 12, 28; Gov.

---

[11] During this initial conversation, defendant joked with Agent Warren and asked whether she was going to need to feed all of the people there dinner because she did not have enough potatoes in the oven and indicated that her "nervous default was humor." (Gov. Ex. 2).

[12] See Miranda v. Arizona, 384 U.S. 436 (1966).

[13] Specifically, Agent Warren advised defendant that she had the right to remain silent; that any statements she made could be used against her in court; and that she had the right to speak to an attorney for advice before they asked her any questions, to have one present during the questioning, to have one appointed for her if she could not afford one, and, in the event she proceeded with questioning without an attorney, to stop answering questions at any time. See (Gov. Exs. 1 & 2); see also (Tr. at 26-27).

Ex. 1).  Defendant then proceeded to make certain incriminating statements.  (Tr. at

36-37; Gov. Ex 2).[14]

Agent Warren provided the advisement of rights and conducted the

interview in a conversational tone, and defendant appeared to understand the

questions asked of her and provided responsive answers, never declined to answer

a question asked of her, never asked for an attorney, and never asked for the agents

---

[14] Defendant also explained that her husband "Leonard" owned the house and that they also had two roommates, one with a six-year-old daughter who shared a room with defendant's seven-year-old daughter.  (Tr. at 22-23; Gov. Ex. 2). Defendant confirmed that her legal name was "Rebecca Nichols," but that she also used her married name, "Rebecca Chadwell," and during the initial background questions, Agent Warren asked, among other things, if she had ever been arrested, at which time defendant inquired if she was under arrest and Agent Warren explained that he did have an arrest warrant and that he would discuss that in a moment.  (Tr. at 14, 27, 33-34; Gov. Ex. 2).  About 12 minutes into the interview, defendant also advised Agent Warren that she had post-traumatic stress disorder as a result of being sexually abused as a child, a sex trafficking victim, and abused by her previous husband.  (Tr. at 25-26; Gov. Ex. 2).  Approximately 42 minutes into the interview, Agent Warren presented her with some images of her daughter, and defendant then explained that she had dissociative identity disorder and that she did not "have all of her memories."  (Tr. at 26, 28-29; Gov. Ex. 2).  She also indicated at approximately 57 minutes into the interview that she was fully aware that her best interest was to tell the agents everything and be truthful, and after a little more than an hour into the interview, after Agent Warren advised her she was under arrest, she again stated that she had dissociative identity disorder, a seizure disorder, and that she had a pacemaker, but that she did not take any medications, and Agent Warren also asked her about the cuts on her legs and she indicated that she was a "cutter," having last cut herself with glass that afternoon, and that she had previously attempted suicide, with her most recent attempt having been a month prior.  (Tr. at 24; Gov. Ex. 2).

to stop questioning her.  (Tr. at 12, 14-15; Gov. Ex. 2).  Though defendant indicated that she was nervous, she was coherent and displayed a consistent personality throughout the interview, demonstrating the ability to communicate appropriately with the agents.  (Tr. at 14, 24-25, 36-37; Gov. Ex. 2).  Additionally, while defendant stated that she had issues with timelines, she answered the agents' questions, usually without any hesitation, and demonstrated recall of past events.  (Tr. at 36-37; Gov. Ex. 2).  Although Agents Warren and Kabrhel were armed with their firearms, they kept them holstered and concealed beneath their shirts.  (Tr. at 12-13).[15]  The agents never made physical contact with defendant and never threatened her or made her any promises.   (Tr. at 14, 34; Gov. Ex. 2).   The interview lasted approximately 70 minutes, ending at 6:49 p.m., see (Gov. Exs. 1 & 2), and defendant was subsequently placed under arrest pursuant to an arrest warrant, see (Gov. Ex. 2); [Doc. 5].

## II. ANALYSIS

Defendant argues that the April 16, 2015, search warrant for the 815 Gateshead Lane residence was invalid because the affidavit upon which it was

---

[15] Agent Warren testified that he assumed Agent Mangrum was armed, but he could not recall whether her firearm was visible, though he stated that none of them displayed their weapons during the advice of rights or the course of the interview.  (Tr. at 13).

12

obtained lacked sufficient probable cause since "[t]he information contained in the affidavit [did] not establish a sufficient nexus between the alleged offense and the residence," and that the good faith exception does not apply in this case.  [Doc. 32 at 5-11].  Defendant also argues that the post-seizure search of her cellular phones, computers, and other electronic devices exceeded the scope of the search warrant and that any evidence obtained as a result of these warrantless searches is due to be suppressed.  [Id. at 11-16].  Finally, defendant also seeks to suppress her statements because she contends that her waiver of her Miranda rights was neither knowing nor voluntary.  [Doc. 48 at 8-11].

## A.   Search and Seizure of Evidence Pursuant to the Search Warrant

### 1.   *Probable Cause*

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."  United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted).  That is,

13

"[p]robable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted).  "Probable cause deals 'with probabilities [which are] . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015) (citation omitted).

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.  In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a

14

hypertechnical manner." Id. at 1361 (citation omitted). Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. (citations omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014) (citations omitted). Furthermore, "[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).[16]

---

[16] In fact, "an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally." New York v. P.J. Video, Inc., 475 U.S. 868, 875 (1986) (footnote omitted). And, "[t]he term probable cause, . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion . . . Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision." Id. at 876 (second, third, and fourth alterations in original) (citations and internal marks omitted). That is, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," Gates, 462 U.S. at 232, and "[c]ertainty has no part in a probable cause analysis," United States v. Frechette, 583 F.3d 374, 380 (6th Cir. 2009) (citation omitted).

Defendant contends that the search warrant affidavit is deficient because it fails to establish a nexus between the residence to be searched and the alleged offense. See [Doc. 32 at 5-11]. In support of this argument, defendant maintains that Agent Warren provided "[n]o information in the affidavit [to] attest[] to the reliability of Pot himself, or of independent verification of this or any other information provided in this or any other investigation." [Id. at 6, 8]. Defendant also maintains that the fact that the metadata from Pot's photographs revealed that the images at issue were produced on February 12, 2015, likewise does not provide a link to her or to the residence since it "[does] not disclose the photographer or the location the photographs were taken," was not linked to Pot's travel dates, and does not establish that she "resided at the target residence at or around that date." [Id. at 8-9]. She further maintains that although the government relies on the fact that images of Minor Victim 1 matched images from her Facebook page, the affidavit failed to "disclose that the agents had in fact determined that the Facebook account belonged to [defendant], or, for that matter, to an individual that lived at the target residence," and that "a mere comparison of 'sanitized copies of some of the images of Minor Victim 1' with photographs on the identified Facebook account" is insufficient as there was "[n]o independent verification . . . of the claimed resemblance, perhaps by someone who actually [knew] any of the individuals in

16

question."  [Id. at 9-10 (emphasis omitted)].  Finally, defendant asserts that "[a]t bottom, in its reliance on Pot's statements, the affidavit assumed as true without independent verification of any kind, allegations made by a child pornography defendant in a foreign jurisdiction aimed at a United States citizen," and that "[b]ecause of these infirmities, the affidavit does not disclose a nexus between the alleged crime and the place to be searched."  [Id. at 9, 11].

Contrary to defendant's contention, Agent Warren's affidavit alleged sufficient facts to establish probable cause to believe that evidence of a crime would be found in the subject residence.  Indeed, Agent Warren averred that NPTN investigators had interviewed Pot, a suspected child pornographer, and that he stated that certain images of child pornography located on digital media devices he owned were "produced for him by a woman named Rebecca Chadwell, who live[d] at 815 Gateshead Lane," that he had previously traveled from the Netherlands to that residence in Lawrenceville, Georgia, and stayed there during his visit, at which time he met Minor Victim 1, and that he had continued to communicate with "Chadwell via the Internet after he returned to the Netherlands."  [Doc. 25-1 at 8 ¶¶ 4-5 (all caps omitted)].  The facts set forth in the affidavit connected the child pornography to defendant and to her residence since the evidence being sought included sexually explicit photographs of Minor Victim 1, whom defendant

described as her daughter in photographs posted on Facebook, and Pot's claim that defendant resided at 815 Gateshead Lane was corroborated by independent investigation, establishing probable cause to believe that evidence of child pornography would be found at defendant's residence.

While defendant challenges the absence of information in the affidavit establishing Pot's credibility, or the reliability of the information he provided, [Doc. 32 at 6], her argument overlooks the fact that Agent Warren also averred that various records searches confirmed that defendant resided at the 815 Gateshead Lane residence, that the pornographic images depicting Minor Victim 1 produced to Pot matched the photographs of a child depicted on defendant's Facebook page that captioned her as defendant's daughter, that the images obtained from Pot had just been taken only two months prior to the investigation, and that the nature of the crime established a fair probability that evidence of the crime would be found in the residence since child pornographers "[r]arely dispose of their collection of sexually explicit material involving minors," [Doc. 25-1 at 9-11 ¶¶ 7-12, 14]. Therefore, Agent Warren sufficiently "corroborated [Pot's] statements, which included details and apparent first-hand knowledge, by his own . . . research," and "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." United States v. Brito, Criminal Case No.

1:11–cr–00060–ODE–RGV, 2012 WL 484829, at *9 (N.D. Ga. Feb. 9, 2012) (last alteration in original) (footnotes, citation, and internal marks omitted). "The totality of the facts set forth in Agent [Warren's] affidavit sufficiently support a person of reasonable caution in believing that evidence of a crime would be found on computers, cell phones, and other electronic storage devices at [defendant's] residence, and that is all that is required for probable cause." United States v. Harvey, CRIMINAL ACTION NO. 1:15-cr-00053-TWT-RGV-1, 2015 WL 9685908, at *18 (N.D. Ga. Nov. 30, 2015), adopted by 2016 WL 109984, at *1 (N.D. Ga. Jan. 8, 2016) (citation omitted); see also United States v. Piloto, 562 F. App'x 907, 913 (11th Cir. 2014) (per curiam) (unpublished) (finding the search warrant affidavit established a nexus between defendant and the residence by explicitly stating that defendant lived in the residence and explaining that the nature of the crime demonstrated a fair probability that evidence would be found in the residence).

Moreover, "[c]ourts have uniformly rejected defense arguments that further investigation should have been conducted to either corroborate or to negate the information in the affidavit or else the search warrant lacks probable cause." Brito, 2012 WL 484829, at *8 (citations and internal marks omitted).  In fact, while defendant contends that the agents should have confirmed that Pot traveled to the United States during the relevant time period, that he actually communicated with

19

defendant via the Internet, that the Facebook account actually belonged to defendant or was connected to her residence by way of subpoena, and that they should have independently verified that the images of Minor Victim 1 was in fact the same child identified on the Facebook account by possibly interviewing someone who actually knew any of the individuals in question rather than just making a "mere comparison" of the images, [Doc. 32 at 8-10], probable cause must be evaluated "based on what information was actually presented to the magistrate, not based on what information could have been presented after further investigation, but was not," Brito, 2012 WL 484829, at *8 (citation and internal marks omitted). "Despite [defendant's] challenge to the veracity of any statements made by [Pot], at the probable cause stage, a judge is not concerned with concepts of beyond a reasonable doubt, preponderance of the evidence, or even a prima facie case, but rather whether considering the affidavit in a common-sense and practical manner, there is a fair probability that evidence of a crime may be found at the location to be searched." Id. at *9 (citation and internal marks omitted).

Furthermore, "an informant's tip is deemed adequately corroborated when there exists a disincentive for the informant to lie," and "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility sufficiently at least to support a finding of probable cause to search." United States

v. Villaverde-Leyva, Criminal Action File No. 1:10–CR–035–RWS/AJB, 2010 WL

5579825, at *7 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga.

Jan. 14, 2011) (citations and internal marks omitted) (citing United States v. Foree,

43 F.3d 1572, 1576 (11th Cir. 1995)).  "Taking all of the facts and circumstances in the

affidavit into account, a reasonable, common-sense interpretation of the facts laid

out in the application for the search warrant leads to the conclusion that evidence

of a crime might very well be found inside of the [defendant's] residence. Brito, 2012

WL 484829, at *9.  Defendant fails to acknowledge all the facts set forth in the

affidavit as a whole, and her arguments overlook the fact that the "Supreme Court

has warned lower courts of the error of not consider[ing an officer's] affidavit in its

entirety and judging bits and pieces of information in isolation."  United States v.

Lebowitz, 647 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009), adopted at 1342, aff'd, 676 F.3d

1000 (11th Cir. 2012) (per curiam) (alteration in original) (internal marks omitted)

(quoting Massachusetts v. Upton, 466 U.S. 727, 732 (1984) (per curiam)).  Considered

as a whole, the affidavit included sufficient information to establish probable cause

to believe that evidence of the alleged crime would be located in the subject

residence.  Therefore, defendant's contention that Agent Warren's affidavit did not

establish probable cause is without merit.

However, even if the search warrant in this case were found to be defective, suppression of the evidence seized from the residence would not be warranted because law enforcement executing the warrant reasonably relied in good faith on the validity of the warrant.  See United States v. Leon, 468 U.S. 897, 919-21 (1984). Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."   United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and internal marks omitted); see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citation omitted).

There are four exceptions to the Leon good-faith exception doctrine, none of which apply here:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).   Although defendant argues that the good faith exception is inapplicable because the affidavit is so lacking in indicia of probable cause that Agent Warren could not have "held a reasonable belief that probable cause existed to connect the alleged crime with the defendant and the identified residence," [Doc. 32 at 11], for the reasons already discussed, these arguments are without merit.   In addition, there is nothing in the record that even hints that the judge who reviewed the affidavit and signed the search warrant engaged in any misconduct or abrogation of judicial responsibility.   The affidavit set forth sufficient probable cause, and in any case is not "so lacking . . . as to render official belief in its existence entirely unreasonable."   Martin, 297 F.3d at 1313 (citation and internal marks omitted).

Finally, the warrant is facially valid in that it describes in sufficient detail the things to be seized, the location for the search, and it is signed by a United States Magistrate Judge.   Officers executing the warrant would therefore have been justified in believing in its validity, and evidence seized during the execution would not be subject to suppression.   Massachusetts v. Sheppard, 468 U.S. 981, 988-89 (1984).   Accordingly, defendant's motion to suppress evidence is also due to be denied under the good faith exception.

23

2.      *Scope of the Warrant*

Defendant moves to suppress all evidence obtained from the subsequent search of certain evidence, including cellular phones, computers, and any other electronic devices, following their seizure from her residence pursuant to the warrant.  [Doc. 32 at 11-16].  In particular, defendant argues that since the warrant only authorized the agents to "search for and seize" from her residence certain property, including "computers, computer peripherals, electronic media storage devices, and other items as more particularly described in Attachment B," [Doc. 25-1 at 1], and "the agents did not request permission to search digital media post-seizure," [Doc. 32 at 15], the "unauthorized and unconstitutional search of these devices must be suppressed" as beyond the scope of the warrant, [id. at 11-12].

Defendant's argument ignores the portion of the affidavit submitted in support of the search warrant application entitled, "Specifics of Search and Seizure of Computer Systems," in which Agent Warren explained why it was not feasible to search electronic devices during the search of the premises and then specifically requested permission from the Court to "seize all computer hardware, associated peripherals and storage media that may be found on the premises . . . and that may contain some or all of the evidence described in this affidavit and Attachment B, and to conduct an off-site search of the same for evidence, fruits and instrumentalities

of violations of [18 U.S.C. §§] 2252(a) and 2251(b)."  [Doc. 25-1 at 11-13 ¶ 15].  Thus, "Magistrate Judge [Baverman] knew that by issuing the warrant, he was authorizing the search of the content of the computer[s] and other electronic devices, not just the seizure of the hardware that stored the digital information."  United States v. Ilonzo, Criminal File No. 1:12–CR–276–SCJ–GGB, 2015 WL 5827598, at *18 (N.D. Ga. Oct. 6, 2015), adopted at *6.  That is, "where the warrant and accompanying affidavit make clear that the objective of a search includes the contents of a computer [and other electronic devices], the search . . . does not exceed the warrant," and "[b]ecause the searches . . . here were related to the offenses described in the warrant, no additional warrant was required."[17]  Id. at *19 (citations omitted).

To accept defendant's interpretation of the plain language of the search warrant only providing for the "search and seizure" of the items listed in Attachment B would lead to a finding that "Judge [Baverman] intent[ed] to narrow the scope of the warrant to searches of the property and not [defendant's] cell phone [or computers]," without any "evidence, that the final warrant signed by Judge [Baverman] differs in any material way from the warrant Agent [Warren] attached

---

[17] Both defendant and the government make arguments centering around the "container rule," see [Doc. 32 at 13-15; Doc. 28 at 8-11]; however, the Court need not address these arguments as it finds that the subsequent search of the devices at issue was within the scope of the warrant.

to his affidavit when first requesting the warrant." United States v. Hendley, CRIMINAL CASE NO. 1:14-CR-453-ODE-JSA, 2015 WL 7779215, at *4 (N.D. Ga. Dec. 2, 2015). Instead, "Judge [Baverman] appears to have simply signed the warrant, and did not limit or narrow the scope of the warrant[.]" Id. Accordingly, the Court concludes that the post-seizure search of the electronic devices, including any items particularized in Attachment B, did not exceed the scope of the warrant, and defendant's motions to suppress evidence, [Docs. 21 & 25], are due to be denied.

**B.    Defendant's Statements**

Defendant made statements to the agents on the day of the execution of the search warrant that she now seeks to suppress, arguing that her mental impairments prevented her from knowingly and voluntarily waiving her Miranda rights. [Doc. 48 at 8-11; Doc. 57 at 3-6]. The parties do not dispute whether defendant was in custody at the time she made these statements. See [Doc. 53; Doc. 48 at 6-7]. Thus, the issue presented is whether defendant knowingly and voluntarily agreed to waive her Miranda rights.

The government bears the burden of proving by a preponderance of evidence that defendant validly waived her Miranda rights. United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997) (citation omitted); see also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986) (citations omitted). In Miranda, the Supreme Court

acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel [her] to speak where [s]he would not otherwise do so freely."  384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use her statements to secure a conviction, and must inform her of her rights to remain silent and to "have counsel present . . . if [she] so desires." Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise her rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that [s]he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted).  "If the individual states that [s]he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

A defendant may waive her rights if the waiver is made knowingly, intelligently, and voluntarily. Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have

been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted); Edwards v. Arizona, 451 U.S. 477, 482 (1981) (citations omitted); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived [her] rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted). However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver. United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002) (citation omitted). To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167.

Prior to questioning defendant inside the residence during the execution of the search warrant, Agent Warren, in the presence of Agents Kabrhel and Mangrum,

advised defendant of her <u>Miranda</u> rights by reading the rights from a pre-printed Advice of Rights and Waiver form, which specifically advised her that she had the right to remain silent; that any statements she made could be used against her in court; and that she had the right to speak to an attorney, to have one present during the questioning, to have one appointed for her if she could not afford one, and, in the event she proceeded with questioning without an attorney, to stop answering questions at any time. (Tr. at 10-11, 25, 32-33; Gov. Exs. 1 & 2). Defendant also read the form aloud to the agents to ensure that she could read English and that she completely understood her rights, (Tr. at 10-11; Gov. Ex. 2), and she then acknowledged that she understood her rights, and with those rights in mind, that she wished to waive them and speak with the agents, (Tr. at 11, 27-28; Gov. Exs. 1 & 2). After defendant waived her rights, Agent Warren proceeded to question her, and defendant then made certain incriminating statements that she now moves to suppress. (Tr. at 36-37; Gov. Ex. 2).

Defendant contends that at the time she was interrogated, she was "suffering from post-traumatic stress disorder, dissociative identity disorder, associated cognitive issues manifesting themselves as memory problems, and had actively been engaging in self-harm by cutting herself"; that her "physical and mental states were known to [the] agents at the time of the interrogation," but "their actions exploited

these conditions"; and these mental conditions therefore rendered her "waiver of her Miranda rights unknowing and involuntary." [Doc. 48 at 8-9]. However, "while a defendant's mental condition is a significant factor in the voluntariness calculus, even the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless [t]he police exploited this weakness with coercive tactics." United States v. Tolbert, Criminal Action File No. 1:14–cr–102–TCB, 2015 WL 3505147, at *9 (N.D. Ga. June 1, 2015), adopted at *1 (alteration in original) (emphasis, citations, and internal marks omitted). That is, "where a defendant suffers from a mental disorder, courts have held that the existence of the disorder itself does not make a *Miranda* waiver unknowing or involuntary[.]" Id. (citations omitted). Rather, "a defendant must be impaired to a substantial degree to overcome [her] ability to knowingly and intelligently waiver [her] privilege against self-incrimination," and "the record must establish that, due to a mental disorder . . ., the defendant was in fact unable to comprehend and effectively waive [her] rights." United States v. Quinones, No. CR410–223, 2012 WL 2064705, at *3 (S.D. Ga. May 22, 2012), adopted by 2012 WL 2064847, at *1 (S.D. Ga. June 6, 2012) (footnote, emphasis, citation, and internal marks omitted).

Considering the totality of the circumstances, the Court finds that defendant knowingly, intelligently, and voluntarily waived her rights and agreed to speak with

the agents.  Defendant was read her <u>Miranda</u> rights and was advised of her rights to remain silent and to have counsel present, and warned that anything she said could be used against her in court.  (Tr. at 10-11, 25, 32-33; Gov. Exs. 1 & 2).  She also read her rights aloud, signed the waiver portion of the form indicating that she agreed to waive those rights, and then proceeded to make incriminating statements.  (Gov. Exs. 1 & 2).  There is no evidence that the agents physically or verbally threatened defendant or made her any promises, and in fact, Agent Warren testified, and the audio recording confirms, that Agent Warren spoke to her in a conversational tone, that defendant appeared to understand the questions being asked of her and provided responsive and coherent answers, that she never declined to answer any questions or request that the agents stop questioning her, that she displayed a consistent personality during the interview, and that she never appeared to be suffering from any type of mental impairment that affected her ability to understand or communicate with the agents.  (Tr. at 12-15, 24-25, 34, 36-37; Gov. Ex. 2).  While she indicated that she had trouble with her memory and specifically with timelines of events, she did not appear to have any significant recall issues, and in fact, she was able to provide background information, specific details of her life, and recall circumstances surrounding certain images that were presented to her.  <u>See</u> (Gov. Ex. 2).  Though the agents were armed, their firearms remained holstered at

all times, (Tr. at 12-13), and upon defendant's request, Agent Mangrum remained

in the room during the interview and defendant was also allowed to have one of her

dogs remain with her in the room, (Tr. at 8-10, 25, 29-30; Gov. Ex. 2).[18]  Simply put,

"the lack of police coercion requires the Court to reject [d]efendant's argument that

---

[18] While defendant suggests that the agents attempted to deceive her by not providing her with a copy of the search warrant prior to any questioning and by not advising her at the outset that Agent Warren also had a warrant for her arrest, [Doc. 48 at 10-11], there is no doubt that defendant knew the agents were there to execute a search warrant and she even asked whether she was under arrest, at which time Agent Warren explained that he did have an arrest warrant for her, see (Gov. Ex. 2). Indeed, Rule 41 of the Federal Rules of Criminal Procedure only requires that the "officer executing the [search] warrant [] give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property," Fed. R. Crim. P. 41(f)(1)(C), but it does not require the officer to do so prior to any questioning.  Neither was Agent Warren required to immediately advise defendant of the arrest warrant, but once she asked about it near the beginning of the interview, he verified that he had a warrant for her arrest and this discussion took place prior to defendant making any incriminating statements. See (Gov. Ex. 2).  Defendant also argues that the location of the interview, i.e., "a basement let to a different tenant," supports "the inference that agents[] intended to exploit [her] mental distress," [Doc. 57 at 5]; however, the Court fails to see how questioning defendant in her own home, albeit in a room being rented to another individual, could cause her any more distress than being taken for questioning to another, unfamiliar location, such as the FBI office, as she suggests should have occurred, see United States v. Mwangi, Criminal File No. 1:09–CR–107–TWT, 2010 WL 520793, at *10 (N.D. Ga. Feb. 5, 2010), adopted at *1 (finding defendant validly waived Miranda rights and that his statements were voluntary and not the product of coercion where he was not wearing handcuffs, was interviewed in familiar surroundings, and  the officers' firearms remained holstered at all times, among other things).  The Court likewise does not discern any coercion from the fact that the agents audio recorded the interview at defendant's residence instead of transporting her to the FBI office where it could have been video recorded.

the waiver was involuntary." United v. Stevenson, Criminal Case No. 1:ll–CR–350–ODE–RGV, 2012 WL 1418635, at *4 (N.D. Ga. Apr. 23, 2012) (citation omitted); see also United States v. Moya, 74 F.3d 1117, 1120 (11th Cir. 1996) (finding mental deficiencies alone are not sufficient to render confession involuntary in the absence of police coercion).

In addition, the record clearly shows that defendant's waiver was made knowingly and intelligently. Although defendant maintains that she suffers from various mental health conditions, she confirmed that she did not take any medications for any of these conditions, see (Gov. Ex. 2), and she has presented no evidence, including any medical records or supporting documentation, of these conditions, or their impact on her mental status beyond her own claims and self-diagnoses.[19] "Although a defendant's impaired mental state . . . may prevent that person from understanding the nature of . . . her waiver, this is [simply] not the case

---

[19] Defendant requests that the Court "reopen the evidentiary record" should it find that an expert opinion on her mental health status "is relevant to a determination of the issues raised by her motions," [Doc. 57 at 7]; however, the Court already provided defendant an opportunity to reopen the hearing, [Doc. 35 at 38-39], but defendant did not request to do so, [Docket entry dated 10/08/2015], nor has she produced any evidence of her mental health status, such as medical records, treatment notes, or any supporting documentation for her diagnoses at issue beyond her own statements that she suffers from various mental health conditions. Moreover, she has made no showing that any of her alleged conditions affected her waiver and consent to speak to the agents.

here." <u>Barbour</u>, 70 F.3d at 585 (internal citation omitted).  Indeed, the audio recording confirms that defendant appeared to understand the advice of rights, could read the rights in English, was able to sign the waiver portion of the form, and that she even expressed during the interview that it was in her best interest to be truthful with the agents.  (Gov. Exs. 1 & 2).  There is simply "no evidence in the record indicating that on the day the agents questioned [defendant], [she] was affected by any [mental] disorders," and she "did not appear to be suffering from any mental disorder, nor did [her] answers suggest that [s]he was." <u>Tolbert</u>, 2015 WL 3505147, at *11.  Nothing in the record calls into question defendant's ability to have understood her situation, her <u>Miranda</u> rights, or her ability to knowingly and intelligently waive those rights, and defendant "has failed to refute the government's evidence establishing that, on this particular occasion, [s]he was fully capable of appreciating both the nature of [her] rights and the consequences of waiving them." <u>Quinones</u>, 2012 WL 2064705, at *1, 3.  Furthermore, "it did not appear that [d]efendant was particularly impressionable or easily manipulated by the agents," and in fact, she "easily and without hesitation disagreed with some of the statements the agents made[.]" <u>United States v. Varnell</u>, Criminal Indictment No. 1:13–CR–394, 2014 WL 5517923, at *13 (N.D. Ga. Oct. 28, 2014), adopted at *3; <u>see also</u> (Gov. Ex. 2).  On these facts, the government has shown that, under the totality

of the circumstances, defendant was advised of her rights, was aware of the nature of her rights being abandoned and the consequences of her decision to abandon them, and that she knowingly and intelligently waived her <u>Miranda</u> rights.  <u>See Garrett v. Beard</u>, No. 14CV1572 BEN (PCL), 2015 WL 1727936, at *19-20 (S.D. Cal. Apr. 15, 2015), adopted at *4 (finding defendant voluntarily, knowingly, and intelligently waived his rights even though he was in the hospital being treated with narcotic painkillers, had recently attempted suicide, and had a history of mental illness since he was able to communicate effectively with the officers, provided responsive and comprehensible answers, and the record, including the transcript of the recorded interview, did not "suggest that defendant's mental or medical condition interfered with his ability to understand what [the] Detective [] was saying to him, including regarding the *Miranda* advisements"); <u>see also</u> <u>United States v. Gordon</u>, 638 F. Supp. 1120, 1134-44 (W.D. La. 1986) (finding defendant's waiver knowing and voluntary despite testimony of expert witnesses that she suffered from dependent personality disorder, post-traumatic stress disorder, and battered woman syndrome, among others).  Thus, the statements defendant made on April 16, 2015, are not due to be suppressed.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that defendant's motions to suppress evidence and statements, [Docs. 21, 22, & 25], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 29th day of April, 2016.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE